*case unsealed per court order 7/5/18 ajs*

# UNITED STATES DISTRICT COURT
for the
Southern District of California

FILED
MAY 29 2018
CLERK US DISTRICT COURT
SOUTHERN DISTRICT OF CALIFORNIA
BY _____ DEPUTY

In the Matter of the Search of )
*(Briefly describe the property to be searched* )
*or identify the person by name and address)* ) Case No. **18MJ2807**
Residence located at 3940 Honeycutt Street, Apt. # 6, )
San Diego, CA 92109 )
)

## APPLICATION FOR A SEARCH WARRANT

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location)*:
Residence located at 3940 Honeycutt Street, Apt. #6 San Diego, CA 92109 as more fully described in Attachment A

located in the ___Southern___ District of ___California___, there is now concealed *(identify the person or describe the property to be seized)*:

See Attachment B

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:
☑ evidence of a crime;
☑ contraband, fruits of crime, or other items illegally possessed;
☑ property designed for use, intended for use, or used in committing a crime;
☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| 18 U.S.C § 922(g)(1) | Felon in Possession of a Firearm/Ammunition; |
| 18 U.S.C. § 922(a)(1)(A) and (B) | Engaging in the Business of Manufacturing Firearms Without a License |

The application is based on these facts:

See Attached Affidavit of Special Agent Ryan T. McGee

☑ Continued on the attached sheet.
☐ Delayed notice of _____ days (give exact ending date if more than 30 days: _____ ) is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

_____
*Applicant's signature*

RYAN T. McGEE / SPECIAL AGENT
*Printed name and title*

Sworn to before me and signed in my presence.

Date: 5/29/18

_____
*Judge's signature*

City and state: San Diego, CA       Mitchell D. Dembin, United States Magistrate Judge
*Printed name and title*

## AFFIDAVIT IN SUPPORT OF APPLICATION FOR SEARCH WARRANT

I, Ryan T. McGee, a Special Agent with the Federal Bureau of Investigation, being duly sworn, depose and state as follows:

## INTRODUCTION AND AGENT BACKGROUND

1. I am a Special Agent (SA) with Federal Bureau of Investigation (FBI), and have been so employed since April 2012. I am currently assigned to the Tucson Resident Agency of the Phoenix Division and I am a federal law enforcement officer within the meaning of Rule 41(a), Federal Rules of Criminal Procedure. As an FBI Special Agent, I am authorized to investigate violations of the law of the United States of America. I am a graduate of the FBI Academy in Quantico, Virginia and have received training in the fundamentals of criminal and national security investigations, crime scene analysis, evidence collection procedures, and interviewing techniques. I am currently assigned to the FBI Joint Terrorism Task Force (JTTF), where I am responsible for investigating, among other things, matters involving domestic terrorism. My assignments with the FBI include investigating both international and domestic terrorism, conducting surveillance, and serving as an operator on the FBI Phoenix SWAT team. I have experience with various weapons including rifles, pistols and automatic weapons. Prior to joining the FBI, I served as an officer in the United States Marine Corps, where I achieved the rank of Captain.

2. During my tenure as a law enforcement officer, I have participated in numerous criminal investigations, which have resulted in arrests, recovery evidence and seizure of property.

1

3. The opinions I have formed and set forth in this affidavit are based on my experience and training, as well as consultation with other experienced investigators, agents of FBI and other agencies, including but not limited to the Bureau of Alcohol, Tobacco, Firearms, and Explosives (ATF). I have set forth only the facts I believe necessary to establish probable cause to show violations of the following statutes:

•Title 18, United States Code, Section 922(g)(1), Felon in Possession of a Firearm/Ammunition;

• Title 18, United States Code, Section 922(a)(1)(A), Engaging in the Business of Manufacturing Firearms Without a License;

4. This affidavit is submitted in support of an application for a search warrant for the residence located at 3940 Honeycutt Street, Apt. 6, San Diego, CA 92109 (the subject residence), which is described more completely in Attachment A.

A records check conducted on the address of 3940 Honeycutt St., Apt. 6 San Diego, CA 92109 shows that JOSHUA JOEL PRATCHARD has been associated with this address from March 2018 until present. Additionally, as described in greater detail below, a Confidential Human Source visited Pratchard at this location and confirmed that it was Pratchard's residence.

5. Based upon my training and experience in conducting criminal investigations of violations of federal firearms and ammunition laws, and upon consultation with senior agents with the FBI and Bureau of Alcohol, Tobacco, Firearms, and Explosives, (ATF), I know that it is common for person who are involved in the illegal possession, distribution, and sale of firearms and/or ammunition to do so from their residence, sheds, place of

2

business, vehicles, and storage units attempting to conceal their dealings from detection by law enforcement.

6. Furthermore, I know that individuals involved in the illegal acquisition, possession and transfer or sale of firearms do so in large part because they do not want to be identified by law enforcement. Therefore, these individuals go through surreptitious means to acquire, maintain, and transfer or sell firearms without complying with state and federal laws. By doing this, these individuals attempt to thwart efforts to trace firearms, making it difficult for law enforcement to identify the last known purchaser of a firearm recovered from a crime scene.

7. Based on my training and experience, I am also aware that cellular telephones are often used by certain individuals to facilitate the commission of criminal acts. Further, your Affiant is aware that important evidence is often located within call histories, text message, instant messages, and voice mails. I also know that cellular telephones are often capable of taking photographs that may have captured evidence of criminal acts. Similarly, I know that individuals involved in the purchase, manufacture and sale of weapons, often use computers to facilitate their activity. Important evidence is often found in emails, banking records, browser history and other documents within these computers.

## PROBABLE CAUSE

8. I have either personally interviewed those whose information is set forth herein, or reviewed reports of interviews or other investigative information prepared by those persons. As a result of my personal participation in this investigation, review of reports, oral and written, made to me by other law enforcement agencies, and others, I am

3

familiar with the circumstances of the events and circumstances described in this Affidavit. Based on the following facts, I submit that there is probable cause to search the specific residence and facilities described in Attachment A for the evidence of these crimes further described in Attachment B.

9. There is probable cause to believe that violations of 18 U.S.C 922(g)(1) and 18 U.S.C. 922(a)(1)(A) and (B) have been committed by Joshua Joel Pratchard (hereafter PRATCHARD). Specifically, there is probable cause to believe that PRATCHARD committed the offenses listed above and probable cause to search the premises described in Attachment A for evidence of these crimes, as described in Attachment B.

10. Title 18 U.S.C. 922(g)(1) provides:

(g) It shall be unlawful for any person –

(1) who has been convicted in any court of, a crime punishable by imprisonment for a term exceeding one year;

to ship or transport in interstate or foreign commerce, or possess in or affecting commerce, any firearm or ammunition; or to receive any firearm or ammunition which has been shipped or transported in interstate or foreign commerce.

11. Title 18 U.S.C. 922(a)(1)(A) states:

(a) It shall be unlawful –

(1) for any person –

(A) except a licensed importer, licensed manufacturer, or licensed dealer, to engage in the business of importing, manufacturing,

4

or dealing in firearms, or in the course of such business to ship, transport, or receive any firearm in interstate or foreign commerce;

12. This investigation began as a result of information provided by a Confidential Human Source (CHS), hereinafter referred to as CHS-1, who participated in operations with the militia group Arizona Border Recon (AZBR), which is an armed militia group that conducts anti-illegal immigration operations along the U.S./Mexico border. The focus of the border operations is to monitor, deter, and report to the U.S. Border Patrol information regarding alien smuggling organizations and/or drug trafficking organizations. CHS-1 has excellent access and participates in operations carried out by the militia group members near the border. CHS-1 was opened in January 2018. CHS-1's motivations includes both patriotism and financial interests. To date, CHS-1 has been paid approximately $12,000, including expenses. Records reveal that between approximately 2002 and 2005, CHS-1 suffered a number of criminal convictions for passing bad checks, driving while intoxicated, and driving on a suspended license. The information provided by CHS-1 has proven reliable in the past and has been corroborated by audio and video recordings of conversations between CHS-1 and other militia group members.

13. CHS-1 first came in contact with PRATCHARD, a resident of California, when PRATCHARD traveled from California to southern Arizona to take part in a border operation with AZBR from January 27, 2018 through February 1, 2018. While on the operation, PRATCHARD carried what appeared to be a short-barreled rifle (SBR) with a silencer and rifle optic. Photographs taken of the group participants show PRATCHARD carrying the possible SBR and rifle optic. PRATCHARD became visibly angry when he

5

was told he could not have a silencer on his weapon. He also became angry when he learned he could not go "hands on" with illegal aliens crossing the U.S/Mexico border.

14. PRATCHARD admitted to CHS-1 that he builds weapons for others using fake serial numbers, and that he reloads / manufactures his own ammunition. PRATCHARD returned to southern Arizona to visit with CHS-1 between April 9, 2018 and April 14, 2018. PRATCHARD brought a number of firearms with him in his 2018 white Ford F-150 pickup truck bearing California License Plate "SCFLDS" and/or VIN 1FTEW1EG8JKD08460, including a 9mm SBR, a sniper rifle, a .308 rifle, and one .45 caliber 1911 pistol. The investigation has revealed that PRATCHARD regularly drives this vehicle and parks it at or near the subject residence.

15. Investigation has revealed that on March 6, 2002, PRATCHARD, who was on active duty with the U.S. Marine Corps, was arraigned on drug charges in a general court-martial. Charges stem from allegations that between June 1, 2001 to August 24, 2001, PRATCHARD unlawfully used and distributed Methylenedioxymethamphetamine (ecstasy), a Schedule I drug, each offense punishable by imprisonment for a term exceeding one year. A trial took place on March 20, 2002 and April 9, 2002, after which PRATCHARD was convicted of the wrongful use of ecstasy and three specifications of the wrongful distribution of ecstasy, all in violation of Article 112a, Uniform Code of Military Justice, 10 U.S.C. 912a. The military judge, sitting as a general court-martial, sentenced PRATCHARD to confinement for three (3) years.

PRATCHARD appealed his conviction to the U.S. Navy-Marine Corps Court of Criminal Appeals in Washington, D.C. In an Order dated May 18, 2004, PRATCHARD's conviction was affirmed.

16. Further investigation has revealed that on August 19, 2008, PRATCHARD was indicted in United States District Court for the Northern District of California, in United States v. Joshua Pratchard, CR-08-00553-001 MMC on one count of Assault Resulting in Serious Bodily Injury, a felony in violation of 18 U.S.C. United States Code, Section 113(a)(6). PRATCHARD plead guilty to the charge and was sentenced on October 21, 2009 to three (3) years of probation and ordered to pay $19,516.00 in restitution to the victim. PRATCHARD was rearrested on July 26, 2011, for a probation violation and sentenced on September 14, 2011 to 46 days in custody. Due to the criminal convictions listed above, it is unlawful for PRATCHARD to possess firearms or ammunition. On May 24, 2018, ATF verified that neither PRATCHARD nor his wife, MELISSA PRATCHARD, possess a license to manufacture or deal in firearms.

17. On April 10, 2018 PRATCHARD and CHS-1 went target shooting in the southern Arizona desert. During that time they discussed the firearm that PRATCHARD was shooting, his practice of building firearms, ammunition and other gun related topics. An audio recording of the conversation between the two reveals in part the following:

7:02 a.m.

CHS: "Dude, that sub (ammunition) is hard to fucking find."

PRATCHARD: **"Yeah, that's why I make mine."** "They have some at Sportsmen's Warehouse in Tucson, $50 for a pack of 20."

7

7:13 a.m.

CHS: "Was this a 80?"

PRATCHARD: "This is 80. **I built that as a 9mm.** It uses a Uzi clip."

CHS: "How much does it cost to build one of these?"

PRATCHARD: **"That's like fucking $2,200 in parts."** Wait till you shoot that thing, though, man. You won't want to fucking…You'll go back to your Daniel and be like, 'Fuck, I want piston,' they're fucking awesome.

7:16 a.m.

CHS: "Did you build this one, or is this one that you kind of?"

PRATCHARD: **"Yup, built this one too. From scratch…"**

18. During the recorded conversation, PRATCHARD can be heard explaining how he builds the firearms:

7:29 a.m.

DAN KING: "Wow, you build 'em from scratch?"

PRATCHARD: **"Mm-hmm, and mill out the layers."**

DAN KING: "Freaking amazing."

PRATCHARD: **"I have a jig at home that allows me to mill it out with a router. You put a uh mill, end mil bit on the router. Set the jig on there and you just put it in a vice and work it back and forth."**

19. PRATCHARD also explained the markings on the firearms he manufactures:

7:31 a.m.

DAN KING: "So is this, is this you here, SD Tactical, or whatever?"

8

PRATCHARD: "Uh-huh, I just mark all of my stuff so that if anyone sees me out shootin' they don't fuck with me. Most of my stuff I mark."

DAN KING: "Hmm."

PRATCHARD: "But that's before I realized that there was a SD Tactical in Arizona. I was like, 'Oops.' I was doing San Diego. I put Pacific Beach, cause that's where I'm at. I put Pacific Beach, cause that's where I'm at."

20. PRATCHARD provided more detail about how he manufactures his firearms:

PRATCHARD: "Yeah, I thought that was the 300, so I didn't even grab mags for it. I'm building my first bolt action right now, 6.5 Creedmoor. **So I just bought a bunch of armorer's stuff, uh, tools work that. I, I have, I have a full functioning armorer's setup at my house now, like every single too[l] that you, an armorer could use. I basically taught myself everything...."**

7:36 a.m.

PRATCHARD: "You wanna see the 9mm to the (inaudible) that I built?"

CHS: "Yeah."

PRATCHARD: "This is my everyday, like, if I'm out here, would be my carry gun. And this thing I can beat to shit. It just keeps working.

21. PRATCHARD explained the markings he puts on his firearms as follows:

PRATCHARD: "**Well, it's not registered. And the numbers are just arbitrary. In fact, I think it's MELISSA's birthday 07/10/82.**"

PRATCHARD also admitted he has made firearms for other individuals:

9

PRATCHARD: **"You should see the 9mm I built my brother. It's dope. It's a 7-inch barrel. This (9mm) is a 10.5"**

22. Finally, PRATCHARD also admitted that once milled, an 80% becomes a firearm:[1]

CHS: "An 80% is not considered a firearm."

PRATCHARD: **"It is once you mill it."**

23. On April 14, 2018, PRATCHARD sold CHS-1 a 9mm AR rifle (S/N: SD071082) for $3,000. PRATCHARD admitted the serial number on the rifle was his wife's birthday. Consensual monitoring equipment showed PRATCHARD took the 9mm AR rifle out of his truck, fired multiple weapons, and discussed how he manufactures firearms and reloads his own ammunition. Based on the above admissions from PRATCHARD, there is probable cause to believe PRATCHARD manufactured the firearm in San Diego, CA where he resides and transported it to Arizona.

24. CHS-1 visited PRATCHARD at his residence, 3940 Honeycutt Street, Apt 6, San Diego, CA 92109, between April 26, 2018 and April 28, 2018. While there PRATCHARD showed the CHS-1 where he manufactures the firearms and reloads ammunition, which is in a bedroom closet located in the apartment. CHS-1 took

---

[1] An 80% lower (aka lower receiver) is technically not a firearm. It is a piece of metal. It has no holes or dimples for the selector switch, trigger, and/or the pins that connect the upper receiver and lower receiver. Once the holes are drilled, the lower is considered a firearm. Individuals commonly purchase 80% lowers because you do not have to purchase them from an individual that has a Federal Firearms License (FFL). They can also be shipped directly to your home.

photographs and video footage of the area. PRATCHARD gave CHS-1 two magazines that are compatible with the 9mm SBR he sold to CHS-1 on April 14, 2018.

25. On May 3, 2018, PRATCHARD provided CHS-1 his bank account number (Chase Bank #xxxxx6715) and address (3940 Honeycutt Street, Apt. 6 San Diego, CA 92109), via text message so CHS-1 could wire him $1,800 as a down payment for the purchase of another SBR and silencer PRATCHARD had agreed to sell him. CHS-1 sent three money orders totaling $1,800 as requested by PRATCHARD.

26. Results of a firearms trace for the 9mm AR rifle (S/N: SD071082) conducted by ATF Agents reveals that the serial number is "invalid", meaning it had never been legally registered.

## PROCEDURES FOR ELECTRONICALLY STORED INFORMATION

27. With the approval of the Court in signing this warrant, agents executing this search warrant will employ the following procedures regarding computers and other electronic storage devices, including electronic storage media, that may contain data subject to seizure pursuant to this warrant:

## FORENSIC IMAGING

a. After securing the premises, or if sufficient information is available pre-search to make the decision, the executing agents will determine the feasibility of obtaining forensic images of electronic storage devices while onsite. A forensic image is an exact physical copy of the hard drive or other media. A forensic image captures all the data on the hard drive or other media without the data being viewed and without changing the data. Absent unusual circumstances, it is essential that a forensic image be obtained

11

prior to conducting any search of the data for information subject to seizure pursuant to this warrant. The feasibility decision will be based upon the number of devices, the nature of the devices, the volume of data to be imaged, the need for and availability of computer forensics specialists, the availability of the imaging tools required to suit the number and nature of devices found, and the security of the search team. The preference is to image onsite if it can be done in a reasonable amount of time and without jeopardizing the integrity of the data and the agents' safety. The number and type of computers and other devices and the number, type, and size of hard drives are of critical importance. It can take several hours to image a single hard drive - the bigger the drive, the longer it takes. As additional devices and hard drives are added, the length of time that the agents must remain onsite can become dangerous and impractical.

b.      If it is not feasible to image the data on-site, computers and other electronic storage devices, including any necessary peripheral devices, will be transported offsite for imaging. After verified images have been obtained, the owner of the devices will be notified and the original devices returned within forty-five (45) days of seizure absent further application to this court.

**IDENTIFICATION AND EXTRACTION OF RELEVANT DATA**

c.      After obtaining a forensic image, the data will be analyzed to identify and extract data subject to seizure pursuant to this warrant. Analysis of the data following the creation of the forensic image can be a highly technical process requiring specific expertise, equipment and software. There are thousands of different hardware items and software programs, and different versions of the same programs, that can be commercially

purchased, installed, and custom-configured on a user's computer system. Computers are easily customized by their users. Even apparently identical computers in an office or home environment can be different with respect to configuration, including permissions and access rights, passwords, data storage, and security. It is not unusual for a computer forensic examiner to have to obtain specialized hardware or software, and train with it, in order to view and analyze imaged data.

   d. Analyzing the contents of a computer or other electronic storage device, even without significant technical challenges, can be very challenging. Searching by keywords, for example, often yields many thousands of hits, each of which must be reviewed in its context by the examiner to determine whether the data is within the scope of the warrant. Merely finding a relevant hit does not end the review process for several reasons. The computer may have stored metadata and other information about a relevant electronic record – e.g., who created it, when and how it was created or downloaded or copied, when it was last accessed, when it was last modified, when it was last printed, and when it was deleted. Keyword searches may also fail to discover relevant electronic records, depending on how the records were created, stored, or used. For example, keywords search text, but many common electronic mail, database, and spreadsheet applications do not store data as searchable text. Instead, the data is saved in a proprietary non-text format. Documents printed by the computer, even if the document was never saved to the hard drive, are recoverable by forensic programs because the printed document is stored as a graphic image. Graphic images, unlike text, are not subject to keyword searches. Similarly, faxes sent to the computer are stored as graphic images and not as text. In addition, a particular

13

relevant piece of data does not exist in a vacuum. To determine who created, modified, copied, downloaded, transferred, communicated about, deleted, or printed the data requires a search of other events that occurred on the computer in the time periods surrounding activity regarding the relevant data. Information about which user had logged in, whether users share passwords, whether the computer was connected to other computers or networks, and whether the user accessed or used other programs or services in the time period surrounding events with the relevant data can help determine who was sitting at the keyboard.

  e. It is often difficult or impossible to determine the identity of the person using the computer when incriminating data has been created, modified, accessed, deleted, printed, copied, uploaded, or downloaded solely by reviewing the incriminating data. Computers generate substantial information about data and about users that generally is not visible to users. Computer-generated data, including registry information, computer logs, user profiles and passwords, web-browsing history, cookies and application and operating system metadata, often provides evidence of who was using the computer at a relevant time. In addition, evidence such as electronic mail, chat sessions, photographs and videos, calendars and address books stored on the computer may identify the user at a particular, relevant time. The manner in which the user has structured and named files, run or accessed particular applications, and created or accessed other, non-incriminating files or documents, may serve to identify a particular user. For example, if an incriminating document is found on the computer but attribution is an issue, other documents or files

created around that same time may provide circumstantial evidence of the identity of the user that created the incriminating document.

f.      Analyzing data has become increasingly time-consuming as the volume of data stored on a typical computer system and available storage devices has become mind-boggling. For example, a single megabyte of storage space is roughly equivalent of 500 double-spaced pages of text. A single gigabyte of storage space, or 1,000 megabytes, is roughly equivalent of 500,000 double-spaced pages of text. Computer hard drives are now being sold for personal computers capable of storing up to 2 terabytes (2,000 gigabytes) of data. And, this data may be stored in a variety of formats or encrypted (several new commercially available operating systems provide for automatic encryption of data upon shutdown of the computer). The sheer volume of data also has extended the time that it takes to analyze data. Running keyword searches takes longer and results in more hits that must be individually examined for relevance. And, once reviewed, relevant data leads to new keywords and new avenues for identifying data subject to seizure pursuant to the warrant.

g.      Based on the foregoing, identifying and extracting data subject to seizure pursuant to this warrant may require a range of data analysis techniques, including hashing tools to identify data subject to seizure pursuant to this warrant, and to exclude certain data from analysis, such as known operating system and application files. The identification and extraction process, accordingly, may take weeks or months. The personnel conducting the identification and extraction of data will complete the analysis within one-hundred twenty (120) days of this warrant, absent further application to this court.

h.  All forensic analysis of the imaged data will employ search protocols directed exclusively to the identification and extraction of data within the scope of this warrant.

## CELL PHONE SEARCH WARRANT METHODOLOGY

28.  It is not possible to determine, merely by knowing the cellular telephone's make, model and serial number, the nature and types of services to which the device is subscribed and the nature of the data stored on the device. Cellular devices today can be simple cellular telephones and text message devices, can include cameras, can serve as personal digital assistants and have functions such as calendars and full address books and can be mini-computers allowing for electronic mail services, web services and rudimentary word processing. An increasing number of cellular service providers now allow for their subscribers to access their device over the internet and remotely destroy all of the data contained on the device. For that reason, the device may only be powered in a secure environment or, if possible, started in "flight mode" which disables access to the network. Unlike typical computers, many cellular telephones do not have hard drives or hard drive equivalents and store information in volatile memory within the device or in memory cards inserted into the device. Current technology provides some solutions for acquiring some of the data stored in some cellular telephone models using forensic hardware and software. Even if some of the stored information on the device may be acquired forensically, not all of the data subject to seizure may be so acquired. For devices that are not subject to forensic data acquisition or that have potentially relevant data stored that is not subject to such acquisition, the examiner must inspect the device manually and record the process

16

and the results using digital photography. This process is time and labor intensive and may take weeks or longer.

29. Following the issuance of this warrant, I will collect the subject cellular telephone and subject it to analysis. All forensic analysis of the data contained within the telephone and its memory cards will employ search protocols directed exclusively to the identification and extraction of data within the scope of this warrant.

30. Based on the foregoing, identifying and extracting data subject to seizure pursuant to this warrant may require a range of data analysis techniques, including manual review, and, consequently, may take weeks or months. The personnel conducting the identification and extraction of data will complete the analysis within ninety (90) days of the date the warrant is signed, absent further application to this court.

## GENUINE RISKS OF DESTRUCTION

31. Based upon my experience and training, and the experience and training of other agents with whom I have communicated, electronically stored data can be permanently deleted or modified by users possessing basic computer skills. In this case, only if the subject receives advance warning of the execution of this warrant, will there be a genuine risk of destruction of evidence.

## PRIOR ATTEMPTS TO OBTAIN DATA

32. The United States has not attempted to obtain this data by other means.

//

//

//

## REQUEST TO SEAL

33. It is further respectfully requested that this Court issue an Order sealing, until further order of this Court, all papers submitted in support of this Application, including the Application, Affidavit, and Search Warrant. Sealing is necessary because PRATCHARD is unaware that he is being investigated and the items and information to be seized are relevant to the investigation. Premature disclosure of the contents of this affidavit and related documents could result in destruction of evidence, flight from prosecution, and could otherwise have a negative impact on this investigation.

## CONCLUSION

34. Based upon prior searches of premises and vehicles used by individuals involved in the illegal possession of firearms and ammunition, I believe that I will find articles of personal property and documents evidencing the identity of persons controlling the premises and vehicles.

35. Therefore, based on my training, experience, and the aforementioned facts, which I believe to be true, I believe that probable cause exists that the above described property or a portion thereof will be at the described premises and vehicles when the warrant is served and that such items would constitute evidence of an attempt to procure and/or possess firearms and ammunition by JOSHUA JOEL PRATCHARD, a convicted felon. With the above information, I formally request the issuance of a search warrant for the aforementioned premises.

//

//

36. The statements made in this affidavit are made based on the personal observations and investigation conducted by your affiant, and information communicated or reported to your affiant during the investigation by other participants in the investigation, as the content of this affidavit indicates.

I declare under penalty and perjury that the foregoing is true and correct to the best of my knowledge.

_____
RYAN T. MCGEE
Special Agent
Federal Bureau of Investigation

SUBSCRIBED TO AND SWORN TO
before me this 29 day of May, 2018.

_____
HONORABLE MITCHELL D. DEMBIN
UNITED STATES MAGISTRATE JUDGE

19